## FAIN et al. v. UNITED STATES ex rel. TENNESSEE VALLEY AUTHORITY.
## THOMPSON et al. v. SAME.
### Nos. 9667, 9677.

Circuit Court of Appeals, Sixth Circuit.

Dec. 8, 1944.

R. R. Kramer, of Knoxville, Tenn. (Porter C. Greenwood, R. R. Kramer, and Poore, Kramer & Overton, all of Knoxville, Tenn., on the brief), for appellants Fain and others.

R. R. Kramer, of Knoxville, Tenn. (George W. Jaynes, of Morristown, Tenn., Porter C. Greenwood, R. R. Kramer, and

Poore, Kramer & Overton, all of Knoxville, Tenn., on the brief), for appellants Thompson and others.

H. James Hitching, of Chattanooga, Tenn. (William C. Fitts, Jr., of Knoxville, Tenn., and H. James Hitching, of Chattanooga, Tenn., on the brief), for appellee.

Before ALLEN, HAMILTON, and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

These two cases are before us on appeal from separate awards made by three United States District Judges in condemnation proceedings brought by the United States for the use and benefit of the Tennessee Valley Authority (hereinafter called TVA), pursuant to § 25 of the Tennessee Valley Authority Act, Title 16 U.S.C., § 831x, 16 U.S.C.A. § 831x. The property was condemned for the Cherokee Reservoir in Tennessee. The sole question in each case is whether the award of the three judges represents the fair market value of the land; but as the cases present different issues of fact they will be considered separately.

Case No. 9667 involves the condemnation of a farm of 234 acres for which the TVA paid into court $30,000. The three commissioners appointed by the District Court valued the land at $35,500. On exceptions being filed, a hearing was held before three United States District Judges, who awarded the landowner the sum of $32,000.

The farm is situated on a state highway one and a half miles from Jefferson City, Tennessee, a town of about 2,000 population and the site of a college of some 600 students. The tract contains about 180 acres of cleared land, with the remainder in timber, of which 153,800 board feet were merchantable. The farm, which is excellently watered, included about 54 acres of bottom land which in an average year produced three and a half to five tons of alfalfa, 25 to 40 bushels of barley, and 25 to 50 bushels of corn to the acre. The farm was used mainly for raising dairy cattle, beef cattle, sheep and hogs, and for raising some tobacco. Most of the feed for the cattle was raised on the farm. While some Johnson grass was found on the bottom land, it did not interfere with crops of alfalfa and barley, and certain witnesses said it was excellent for fodder.

There were three residences on the land. The main residence, a large brick house built in 1870 but remodeled at a cost of $6,000 in 1925, had eleven rooms, three bathrooms and five cedar-lined closets, and hardwood floors. The kitchen was electrically equipped, but a wood-burning furnace supplied heat only to half the house. A brick tenant-house dating from the Civil War was equipped with running water and a bathroom and plastered throughout. In addition there was a frame tenant-house in habitable condition. There were two barns on the premises, one a dairy barn constructed by adding a wing to a brick cotton mill which had been built during the Civil War. The barn had concrete flooring and had attached to it a large concrete silo. There was another large barn with a concrete base and a reenforced concrete floor. Smaller buildings included a two-story brick storage house, cattle scales in a concrete pit, chicken houses, garage, tool house, storage cellar, and a laying and brooder house. The outside fences were in good condition, but were eighteen years old, while the inside fences were described as only "fair" or "adequate." There were several hundred shrubs on the place, and the main house was pleasantly set among trees on a hill. The premises also included two orchards with over forty good apple trees, grape vines, dewberries, raspberries and strawberries.

Numerous witnesses testified as to the value of the property. Witnesses for the landowner estimated the value at from $43,000 to $65,000, the figure arrived at usually being in the neighborhood of $45,000, while witnesses for the TVA fixed the value at from $21,000 to $27,000, to which should be added $1,691.10, the conceded value of the timber.

The landowner contends in effect that certain testimony of witnesses for the TVA has no probative value on the ground that they based their estimates on recent sales of other properties. He concedes the correctness of the rule as stated by this court in Welch v. Tennessee Valley Authority, 108 F.2d 95, certiorari denied Welch v. United States ex rel. and for Use of Tennessee Valley Authority, 309 U.S. 688, 60 S.Ct. 889, 84 L.Ed. 1030, that sales at arm's length of similar property are the best evidence of market value. However, he contends that the tracts of land compared with his farm were not similar because of differences of location, improvement, soil, etc., and because owing to his desire to spend his last years

in his old family home he had improved the land for estate, rather than for strictly farm purposes. It is true that the various properties differ in detail. The Cantwell farm is not located near a college town, and it is two miles farther from Rutledge than the landowner's farm is from Jefferson City. The Baer, Peck, Mathis and Turley farms do not have modern residences. The Peck farm is not located on a paved road, and is eight miles from any town, while the Turley farm is ten miles from the nearest town and high school. The Taylor farm has a railroad track through its entire length, and the house is "just a good average farm home." The Mathis farm is some twelve miles from the nearest town.

■ We think the objection that this evidence throws no light on the question of fair market value is untenable. The properties compared with the Fain farm are in the vicinity, partly bottom land and partly upland, suitable for dairy farming. The sales were of farms at least somewhat similar and relatively close to the Fain farm, and were properly considered within the ruling of Jones v. United States, 258 U.S. 40, 42 S.Ct. 218, 66 L.Ed. 453, which holds that the admissibility of such evidence is largely within the discretion of the court.

■ The TVA, on the other hand, claims that the values set by the landowner's witnesses have little or no probative force because they were based on a summation theory or reached by improper capitalization of income. Several of the landowner's witnesses stated, among other things, that they arrived at their estimates by making separate valuations of land and buildings, and adding up the total. This is held to be an improper way of estimating the market value of property involved in condemnation proceedings. Morton Butler Timber Co. v. United States, 6 Cir., 91 F.2d 884; Devou v. City of Cincinnati, 6 Cir., 162 F. 633; United States v. Meyer, 7 Cir., 113 F.2d 387, certiorari denied 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459.

One of the objections to the use of the summation theory is the usual failure in making estimates based on reproduction cost, to make adequate allowance for depreciation of improvements. Here various witnesses for the landowner allowed depreciation of from 35% to 45% or 50%, in their estimates of the value of the buildings.

■ We do not, however, read the testimony offered by the landowner as being based solely on the summation theory. The landowner's witnesses were thoroughly familiar with the land. Three of them had known it for forty or fifty years. Some of them had worked on it or hunted over it repeatedly, and had examined the crops on many occasions. They pointed out the various elements which went to make up market value of the whole, the existence of water available to practically every field, the good location for markets, the high fertilization of the land, the fact that part of it was tiled, and the productivity of the soil. A dairy farmer pointed out that the farm was on an established milk route. One of the witnesses was a real estate salesman, and another a member of the county committee charged with purchasing land. They stated that they were familiar with land values in the vicinity. The testimony of the landowner's witnesses taken as a whole shows that they considered the constituent elements that make up the market value of the land, its availability and capacity for different uses and purposes. Morton Butler Timber Co. v. United States, supra; Alloway v. Nashville, 88 Tenn. 510, 13 S.W. 123, 8 L.R.A. 123.

■ The TVA witnesses were not nearly so familiar with the farm. Hudson, for example, was never on the farm while the timber was standing. Some of the testimony of the TVA witnesses could be accorded little weight. Franklin valued the six-room brick tenant house, which is thoroughly modern, at $100. Carmichael stated that the land was worth $3,000 less, "to some people," with the main residence on it. It is true that if this house were not usable it would be a liability rather than an asset; but numerous witnesses concede not only the beauty of its location but also the existence of extensive improvements which necessarily added to its convenience and desirability. It is uncontradicted that the net production of the land was from $1,800 to $3,600 a year. All these, we think, were proper elements to be considered in determining the value of the property, and were considered by the landowner's witnesses.

■ The statute requires this court to dispose of an appeal without regard to the award or findings of the commissioners or the District Judges. Similarly the judges are required to fix the value of the property regardless of the award previ-

ously made by the commissioners. Title 16 U.S.C. § 831x, 16 U.S.C.A. § 831x.[1] The Supreme Court, in United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 272, 63 S.Ct. 1047, 1051, 87 L.Ed. 1390, has held that the purpose of this enactment was "to free the Circuit Court of Appeals from the strictures commonly applicable to its review of disputed questions of fact." The court continues that the Circuit Court of Appeals "need not blind itself to the special advantages of the tribunals below in evaluating the evidence." The award of the commissioners was made by men exceptionally qualified by experience in valuation of land condemned for the TVA project. They fixed their valuations after viewing the premises and personally hearing the witnesses. The testimony introduced before the District Judges was the same as that before the commissioners except that it included a stipulation as to a single sale, namely the sale of the adjoining farm. The District Judges gave no reason for reducing the valuation of the commissioners. While we recognize that the burden of proof is on the landowner to establish the value of the land (United States ex rel. Tennessee Valley Authority v. Powelson, supra, 319 U.S. at page 273, 63 S.Ct. at page 1052, 87 L.Ed. 1390), in view of the physical description of the land, its soil, its capacity to produce, its buildings and improvements, we conclude that the landowner is entitled to receive $35,500.

Case 9677 involves a 591 acre tract of land used mainly as a stock farm, situated upon a macadam highway seven miles from Morristown, Tennessee. The TVA offered $50,000 for this property. The commissioners found its value to be $68,500, and the court of three District Judges fixed the value at $58,500.

The farm fronted on Holston River for over a half mile, and had about two miles of running water on it. Twenty-five to thirty acres consisted of Holston River bottom land, subject to Johnson grass. About five hundred acres were cultivated, the balance being in blue grass pasture, with the exception of several patches of limestone out-croppings.

The residence was a two-story ten-room brick, some fifty years old. There was a seven-room tenant house, two smaller houses, three barns and a number of smaller farm buildings. The fencing was excellent, consisting of Page woven-wire fence set with locust posts; but the landowner took much of this fencing away with him when the land was flooded.

The landowner usually planted one hundred fifty acres in corn, one hundred acres in small grain, and used the remainder for grazing cattle and hogs. On an average one hundred head of cattle and seven or eight hundred hogs a year were raised.

The landowner filed so-called reports of income for 1940 and 1941. For 1940 he reported the amount received for hogs and cattle at $22,000, and after deducting certain expenditures, calculated a net profit of $11,228.54. For 1941 he reported the amounts received for corn, wheat, barley, oats, tobacco, hay, shucks and straw, and estimated the production cost of many of these items, calculating the net profit to be $13,770.76. While these reports contained definite statements of gross income, they do not list certain admitted expenditures such as taxes and insurance, the cost of lespedeza seed and other items which would properly be figured for an accurate calcu-

[1] Title 16 U.S.C. § 831x, 16 U.S.C.A. § 831x.

" * * * Either or both parties may file exceptions to the award of said commissioners within twenty days from the date of the filing of said award in court. Exceptions filed to such award shall be heard before three Federal district judges unless the parties, in writing, in person, or by their attorneys, stipulate that the exceptions may be heard before a lesser number of judges. On such hearing such judges shall pass de novo upon the proceedings had before the commissioners, may view the property, and may take additional evidence. Upon such hearings the said judges shall file their own award, fixing therein the value of the property sought to be condemned, regardless of the award previously made by the said commissioners.

"At any time within thirty days from the filing of the decision of the district judges upon the hearing on exceptions to the award made by the commissioners, either party may appeal from such decision of the said judges to the circuit court of appeals, and the said circuit court of appeals shall upon the hearing on said appeal dispose of the same upon the record, without regard to the awards or findings theretofore made by the commissioners or the district judges, and such circuit court of appeals shall thereupon fix the value of the said property sought to be condemned."

lation of net profit from the operation of the farm. However, they show that the farm was highly productive, a fact which is virtually conceded, and hence are some evidence of value.

The witnesses for the landowner, called by the TVA "a representative group of land valuation witnesses," estimated the value of the property at figures ranging from $90,000 to $111,370. Witnesses for the TVA, equally representative, varied from $45,000 to $50,000 in their valuations. The defect in all of the landowner's evidence, according to the TVA, was that the witnesses arrived at their valuations by varying forms of the capitalization method, that is by estimating the income and capitalizing it to arrive at the value of the land.

While certain witnesses stated that they based their valuations on their view of what the land would produce, a reading of the testimony as a whole shows that the valuations reflected many other considerations. Bacon, a former employee of a bank who for four or five years appraised farms for loan purposes, set a figure of $93,000 and said that he arrived at this valuation on the "earning power and the desirability of a farm of that size. There isn't another farm in the county comparable in size or productivity or in location in relation to markets and towns. All those things and the fact that the farm was watered as it was were taken into consideration." Lane said that he arrived at his figure from the location involved, the way the land lies, its adaptability for cultivation and productivity for general farming purposes. All of the witnesses testified as to the substantial nature of the improvements made by the landowner and their usefulness in actually increasing the value of the land. It was testified that the farm was in a 30% to 40% better state of cultivation after the landowner had limed it and worked it for several years. This was agreed to in substance by a witness for the TVA, who said that the landowner increased the value of the farm 25% by the way he took care of the land.

The TVA witnesses, basing their estimates largely upon knowledge of sales in the vicinity, gave lower valuations, but none of these was accepted by the commissioners who heard the testimony.

We think the landowner has borne the burden of proving that the farm is worth more than the amount awarded by the District Judges. It was purchased from the Equitable Life Assurance Society in 1935 for $31,200. A field man for the Equitable, witness for the TVA, stated that an insurance company cannot sell farms at, as high figure as an individual. The landowner said that the property was worth $40,000 when he bought it, and McGoldrick, witness for the TVA, stated that it was worth $40,000 in 1935. It is conceded that the increase in land values between the time of purchase and condemnation was 25% to 30%. The landowner says that he spent approximately $20,000 in improving the property, and all witnesses testified to the substantial nature of the improvements which included building a barn and a scale house, erecting many miles of fencing, liming 300 acres, at least 55 of them twice, putting up 30 or 40 gates, putting a new roof on one barn, etc. Granting the force of the TVA's argument, that part of the expenditures is more properly allocated to current maintenance than to capital expenditures, we still think that this record shows that the value allowed by the District Judges is too low. Estimating the value of the farm in 1935 as $40,000, a 25% to 30% increase in value up to the time of condemnation results in a value of about $50,000 to $52,000. A 25% increase because of the improvements and care of the soil, as stated by the TVA witness, results in a valuation of about $62,000. The increase is not shown to result from the operation of the TVA.

Upon consideration of these figures, which are supported by much other evidence, we fix the value of the property at $62,000.

Judgment is rendered for the landowner in case No. 9667 for $35,500, with interest at six per cent per annum on that portion of the award, if any, not heretofore paid into court, from the date of the taking of the property of the landowner by the appellee.

Judgment is rendered for the landowner in case No. 9677 for $62,000, with interest at six per cent per annum on that portion of the award, if any, not heretofore paid into court, from the date of the taking of the property by the appellee.