266 F.2d 515
 Hunter Giers HICKS, Appellant,
v.
UNITED STATES, for the Use of T. V. A., Appellee.
UNITED STATES of America upon the relation and for the use of the TENNESSEE VALLEY AUTHORITY, Cross-Appellant,
v.
AN EASEMENT AND RIGHT OF WAY OVER a TRACT of LAND 250 FEET WIDE and 2,873 FEET LONG in DAVIDSON COUNTY, TENNESSEE, Hunter Giers Hicks, Cross-Appellee.
 No. 13551.
 No. 13552.
 United States Court of Appeals Sixth Circuit.
 May 13, 1959.
 
 Cecil Sims, Nashville, Tenn., for Hunter Giers Hicks.
 Thomas A. Pedersen, Asst. General Counsel, T.V.A., Knoxville, Tenn. (Charles J. McCarthy, General Counsel, Beverly S. Burbage, Attorney, Tennessee Valley Authority, Knoxville, Tenn., on the brief), for United States, for the Use of T.V.A.
 Before ALLEN, Chief Judge, SCHACKELFORD MILLER, Jr., Circuit Judge, and FREEMAN, District Judge.
 ALLEN, Chief Judge.
 
 
 1
 This case arises out of proceedings filed by the Tennessee Valley Authority on April 28, 1954, pursuant to 16 U.S.C. §§ 831-831dd. Notice, complaint and declaration of taking appellant's property under TVA's power of eminent domain were filed. The District Court entered an order appointing three commissioners (Section 831x) to view the property and hear the evidence as to damages. A majority of the commissioners awarded appellant $14,500; the third commissioner filed a minority report calling for an award of $7,985. Exceptions were filed to the award. The hearing de novo by three judges (Section 831x) was waived and the case was heard by the Judge of the United States District Court for the Middle District of Tennessee. The district judge entered a judgment and award reducing the commissioners' award to $7,500.
 
 
 2
 Appeals were filed by both parties.[1] Since this court on appeal is required to consider the entire record "without regard to the awards or findings theretofore made by the commissioners or the district judges" (Section 831x), we do not discuss the previous awards and findings. Appellant claims that she is entitled to an award of not less than $21,000 for the taking of her land and for incidental damages. The TVA contends that the award, both of the commissioners and of the district court, is excessive. Its witnesses' estimates of compensation ranged from $2,600 to $2,900.
 
 
 3
 Appellant's property, 129 acres, is situated 7 miles from the city limits of Nashville. It is bounded on the east by Hicks's private road, which abuts for most of its length upon Warner Park, a park of the City of Nashville. The southerly boundary of the property is formed for about three-fourths of the distance up to the point of its confluence with the Harpeth River, by the irregular course of the Little Harpeth River. A few hundred feet from the end of the western boundary the Harpeth River is crossed by a bridge which is part of Tennessee Highway No. 100, a main traveled highway which bisects the property. In the northeastern corner, which is upland lying south of Highway 100, is the residence.
 
 
 4
 The TVA has condemned an easement strip of bottom land 250 feet wide and containing 16.4 acres, beginning at the east at the private road and running roughly west across Highway 100. The easement is sought for the erection across the property of four steel towers, each 84 feet high and having 8 wires. Two towers have already been erected. The easement crosses the bottom land and cuts the farm roughly in half. The contract permits the TVA not only to place and operate its power lines and towers on the land, but also to clear out trees and undergrowth and to cut trees outside the easement strip for safety of the wires. Beyond the highway in the northeast portion the property includes a tract of land of about 16 acres, not subject to overflow by the rivers, sowed to grass and conceded to be suitable for residential purposes in small acreage lots.
 
 
 5
 Two witnesses for appellant valued the easement strip at around $600 per acre. One witness valued the entire property at $568 per acre. Two witnesses testified that the remaining 113 acres had been reduced in value $100 per acre. One witness placed the reduction at $94 to $95 and a fourth at $125 per acre. These witnesses all took into consideration the undesirability of the towers and the two power lines, each carrying 154,000 volts, each in the line of vision from the northerly residential tract as well as from every part of the property.
 
 
 6
 Each of appellant's witnesses also testified that the easement property was reduced in value because the cutting of trees and breaking down of retaining walls by TVA probably would in the future make it impossible to use the strip for the valuable corn crop grown theretofore. The witness Moss, an expert on soil erosion, testified on that subject only.
 
 
 7
 Trees were cut by TVA within the land of Warner Park. Trees were also cut out by TVA on appellant's property along the bank of the Little Harpeth River where Sugar Creek runs into the Little Harpeth. A rock wall 2½ feet high was torn down at that point. Appellant urges that the destruction of these barriers and other cutting of trees and vegetation in and near the strip will develop a slew under the highway and cause erosion in the bottom land. It was stated in effect that the current of the Little Harpeth River would be increased so that the bottom land, if used for the planting of row crops of corn, would necessarily be subject to substantial erosion. Grimes, a highly qualified witness, testified that the owner would be required inevitably to expend large amounts to keep gullies and a ditch from washing straight through the farm and that the easement strip therefore had no residual value whatever.
 
 
 8
 As evidence that this process had already begun, appellant's husband testified that in the year 1955 he removed 20 wagon loads of limbs of trees and trash from north of the place of cutting on the Hicks property. He had never found such quantities of trash and debris before. He considered that this trash had been floated down in flood time by an increased current in the Little Harpeth River. He said that, since the cutting of the trees in Warner Park, the private road which is the easterly boundary of the property had been washed out as never before. It was shown that a fence made of railroad ties with a wire mesh had been uprooted on the western end of the property. A previous locust fence at the same spot stood up for 15 years. Photographs were introduced supporting these statements.
 
 
 9
 TVA vigorously urges that the entire testimony of appellant's witnesses as to damages introduced before the commissioners is inadmissible and should be stricken out because the main element of damage described in the testimony was the claimed increased current of the river due to the cutting of trees in Warner Park, the property of the city. TVA asserts that the testimony as to this damage is not separable from the damage estimated for other items and must be entirely excluded. The District Court reduced the award of the commissioners on the ground that this testimony should have been stricken out. TVA relies upon a line of cases from California and Illinois, of which San Diego Land & Town Company v. Neale, 88 Cal. 50, 25 P. 977, 11 L.R.A. 604, is typical. As therein held at page 980, of 25 P.:
 
 
 10
 "Appellants contend that the court did not err in refusing to strike out the testimony objected to, because the witnesses were competent to express an opinion as to value, and the reasons for such opinion can only affect the weight to be given to their testimony; but we think that where a witness bases his opinion entirely upon incompetent and inadmissible matters, or shows that such matters are the chief elements in the calculations which lead him to such conclusions, it should be rejected altogether."
 
 
 11
 We are not bound by the decisions below (Section 831x). We consider that this holding has no application here. TVA's attack upon the testimony of appellant's witnesses does not accurately reflect the evidence. By its cross-examination TVA greatly emphasized the subject of erosion of the bottom land but, fairly considered, this was only one feature of the testimony of the witnesses asked to be stricken out. In general the testimony that erosion would be caused in the bottom land and would force appellant not to plant corn there was based, not only upon the cutting of trees by TVA in Warner Park, but also upon extensive cutting of trees, clearing of vegetation, and uprooting of rock walls within appellant's property. Moreover, bearing in mind that the value of land cannot be arrived at with mathematical accuracy, and can only be fairly approximated (Cf. United States ex rel. for Use of Tennessee Valley Authority v. Reynolds, 5 Cir., 115 F.2d 294, 296), we think the evidence was competent. Evidence for appellant was not based entirely nor mainly upon the cutting of trees in Warner Park, nor even on appellant's land. Also, the estimates of damage to the rest of the property were entirely separable as between the damage suffered by the strip and the incidental damage. The objection goes to the weight rather than to the admissibility.
 
 
 12
 Grimes testified that because of the creation of a slew and erosion of the bottom land the 16.4-acre easement strip would be a total loss to appellant. However, Grimes did not limit his testimony to the item of erosion. He also figured as a separate item the incidental damage to the entire property based principally on the erection and operation of the towers and power lines. He said that the upland on both sides of Highway 100 was exceptionally situated for suburban development by its desirable location, being so near Nashville and adjoining Warner Park. He considered that these desirable features were affected in market value by the power lines and towers. Pritchett did not call the danger of erosion the main element of damage. With Pritchett the main element was the incidental injury due to the towers and power lines visible from every point of the property and figured by Pritchett separately. Dale also emphasized the towers and power lines in estimating incidental damages and itemized the damage separately.
 
 
 13
 The incidental damage to the land not taken was the difference between the value of the land before and after the right of way was condemned. 124 A.L.R. 421. Considering the income of the easement strip we conclude that the record supports the estimates of appellant's witnesses as to the market value of the strip at the time of taking. The soil of the bottom land through which the easement runs is extremely rich. Both rivers flood in December and March. For over 50 years the receding flood waters of both rivers have left a rich deposit of Huntington silt loam on the bottom land. Because of this deposit the bottom land does not need to be fertilized and these acres have been put in corn each year without rotation. The average production during the past 15 years has been 15 barrels (75 bushels) to the acre. During the worst drought of this period the land produced 10 barrels (50 bushels) of corn to the acre. The gross yearly income from the bottom land averaged $170 per acre. In view of this high production record, which is undisputed, the valuation given by Edward Hicks, Grimes, and one other qualified witness to the effect that the easement strip at the time of taking was worth $600 an acre, totaling $9,840, is fully sustained by the record. If we estimate the damage for taking of the easement as one-half the value of the 250-foot strip, the damage proved for the easement alone is $4,920.
 
 
 14
 TVA witnesses made much lower estimates than appellant's. They value the bottom land at $350 an acre before the taking and estimated the total damage from $2,600 to $2,900. They allowed nothing for damages outside of the easement strip, gave little consideration to the special productivity of the land. They concede that its quality as soil may be considered, but not its proven productivity. We are cited to no such limitation. On the contrary, such testimony is held to be admissible. Farmers' Reservoir & Irrigation Company v. Cooper, 54 Colo. 402, 130 P. 1004. In this case involving the value of land taken and incidental damage to the residue, the flooding of an orchard and the destruction of crops were items included in the estimate of depreciation of market value of the residue of the land. To the same effect is Weyer v. Chicago, W. & N. Railroad Company, 68 Wis. 180, 31 N.W. 710. The court held that in estimating the value of farm land, its productiveness or the income which may be derived from it is always considered, including the probable future income of the land. While in Wahlgren v. Loup River Public Power District, 139 Neb. 489, 297 N.W. 833, the judgment was reversed because the award was too high, the court held that productivity of the soil and the amount of past crops are to be considered in determination of farm values. To the same effect are Alabama Power Company v. Herzfeld, 216 Ala. 671, 114 So. 49, and an opinion of this court, Fain v. United States ex rel. Tennessee Valley Authority, 6 Cir., 145 F.2d 956; City and County of Denver v. Quick, Colo., 113 P.2d 999, 134 A.L.R. 1120.
 
 
 15
 A more difficult question is presented by appellant's contention that the use of the land for growing the highly valuable corn crop will be completely eliminated due to the increase of the current of the Little Harpeth River. Appellant maintains that a slew will be created in the bottom land so that it will have to be used for the production of soy beans, alfalfa, and similar products less valuable than corn.
 
 
 16
 Appellant is entitled to the most advantageous use of the land. McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205. Also appellant has the burden of proof in establishing the damage. United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390. Assuming, but not deciding that appellant may recover for an increased current cast on her land by the cutting of trees within land belonging to the city, Cf. Spencer v. O'Brien, 25 Tenn.App. 429, 432, 158 S.W.2d 445, a current which will destroy the present most advantageous use of the bottom land, we think appellant has not carried the burden. It is true that TVA has destroyed on appellant's land a rock wall and mock orange trees running along the banks of the Little Harpeth between 500 and 1,000 feet at the confluence of Sugar Creek, planted and erected at that point to hold back the river and preserve the bank. Also TVA has the power to do further extensive cutting under its contract. But this record does not show by the requisite degree of probative evidence that the destruction of these barriers will increase the current of the Little Harpeth River. The tangible evidence relied on is (1) the accumulation of trash in large quantities containing limbs of trees and items of a size never deposited on the land before by flood; (2) the washing of the road as never before; and (3) the uprooting of the fence in one year, whereas the previous fence had never been uprooted in 15 years. While it is asserted that a slew will develop at the lowest point in the easement strip, the lowest point in the bottom land is not within the easement but at the culvert, some 545 feet north of the northern boundary of the easement strip. A highly qualified witness, who had examined the property several times, said that no sign of a slew nor of erosion had appeared within the strip. At least parts of the huge quantities of trash appear to have come from flooding of the Harpeth River rather than from the Little Harpeth.
 
 
 17
 The bottom land is practically level and this fact is not conducive to erosion. It is stated by an expert on flood control that a slew would not develop due to overall flooding of a tract so level. The level of the bottom land has a slope of only 1/10 of 1% and therefore the flood water spreads out somewhat like water from a lake, covering the entire property rather than converging into one current. While appellant's witnesses testified as to their belief that the current would be intensified, a reasonable probability of this result has not been shown. One of appellant's own witnesses, a conceded expert, admitted that what he was testifying about the future increase of the current was speculative. He said, "Nobody knows. I am saying my observation of what will happen. * * * It is all guesswork. It is my feeling about it, my theory."
 
 
 18
 The components of the road, sand and gravel, it was testified, are readily washed out. The washing of the road occurred in the flood of 1955, the second greatest flood in history. This fact would naturally explain the presence of unusual quantities of trash. Since the contention with reference to the creation of an increased current was not established by the preponderance of the evidence, we conclude that the figure of damage to the bottom land estimated by appellant's witnesses was excessive. We award for this item half of the market value of the strip, $4,920, at the time of the taking.
 
 
 19
 As to the incidental damage to the 113 acres left after the 16.4 acres of bottom land have been deducted, the question is less difficult. From a financial standpoint the estimates by appellant's witnesses for incidental injury to the property from the power lines and towers constituted the main item of damages. Four qualified witnesses testified for appellant that the 113 acres had been substantially reduced in value by the presence of four steel towers 84 feet high and twin power lines each carrying 154,000 volts. It was shown that the power lines had reduced the desirability of the northern 16-acre tract fronting on Highway 100 close to Nashville and admitted by witnesses for TVA to be suitable for suburban residential purposes. Clearly the injury done to the property by the presence of power lines and steel towers is not merely speculative. As stated by one qualified witness:
 
 
 20
 "I feel like the reason that I had this incidental damage was that the 250-foot power line going through the heart of Mr. Hicks' farm, would deduct from the value of the farm at — 113 acres, what was left, at about $95.00 per acre; that anybody that was interested in buying the farm before the TVA went through there and took the 16.4 acres, if they looked at it and I had a buyer for it, and like I mentioned before, I felt sure that I could produce a buyer that would give $103,000.00 for it, but that same buyer came back, we will say, in a hypothetical case, and, say, one day I took him out there and there were no towers and three weeks later he came back and neither he nor I knew about it and they were there, I feel like it would damage it at least $10,000, or $95.00 an acre. I am sure it would. It might damage it more."
 
 
 21
 The land was conceded to be a beautiful property. The damage done to the residue of the land over and above the easement strip included damage to esthetic values. See Ohio Public Service Company v. Dehring, 34 Ohio App. 532, 172 N.E. 448, which held that the unsightliness of towers and transmission lines may be considered in the award of damages for taking of farm land for a right of way for power lines, as unsightliness might affect the value of the land. Texas Power & Light Company v. Jones, Tex.Civ.App., 293 S.W. 885. Cf. Fain v. United States ex rel. Tennessee Valley Authority, 6 Cir., supra, 145 F.2d 958.
 
 
 22
 The apprehension of injuries to person or property by the presence of power lines on the property is founded on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land. Kentucky Hydro-Electric Company v. Woodward, 216 Ky. 618, 287 S.W. 985; Oklahoma Gas & Electric Company v. Kelly, 177 Okl. 206, 58 P.2d 328. This is also the law in Tennessee. See Alloway v. City of Nashville, 88 Tenn. 510, 526, 13 S.W. 123, 8 L.R.A. 123, which holds that it is a question for the jury whether a reasonable apprehension of danger from inherent defects and unavoidable accidents may exist, and, if so, such an apprehension so far as it depreciates the present market value of the land not taken is an element of incidental damages. From this record with its details as to the structure of the power lines and towers we find that the apprehension is reasonable. A TVA witness of 19 years experience testified that the towers might attract lightning better than trees. As to the figure for incidental damage, taking into consideration the testimony of all the witnesses on this point, we find that $90.00 per acre is a fair allowance, amounting to $10,170.00 for the 113 acres.
 
 
 23
 Judgment is rendered for the land owner for $15,090.00 with interest at 6% per annum on that portion of the award, if any, not heretofore paid into court, from the date of the taking of the property by the TVA.
 
 
 
 Notes:
 
 
 [1]
 For convenience, in view of the appeal and cross-appeal, appellant Hicks in No. 13,551 will be called appellant throughout. Appellee in No. 13,551 and cross-appellant in No. 13,552 will be called TVA throughout