No. 30,382.

THE UNITED POWER AND LIGHT CORPORATION OF KANSAS, *Appellant*,
v. CHARLES R. MURPHY and LAURA MURPHY, *Appellees*.

(9 P. 2d 658.)

Opinion
filed April 9, 1932.

*Arthur Hurd*, of Abilene, *C. W. Burch, B. I. Litowich* and *La Rue Royce*, all of Salina, for the appellant.

*S. S. Smith*, of Abilene, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an appeal from an award of damages made by the jury, and approved by the trial court, in a proceeding to condemn a right of way for an electric transmission line across the farm of Charles R. Murphy in Dickinson county. For convenience we shall refer to the landowner as plaintiff and the condemning corporation as defendant, being the terms used in reference to them in the court below. The principal questions here argued are the elements which should be taken into consideration in determining the amount of the award. They arise on objections to evidence received, the exclusion of evidence offered, and the instructions of the court, and it is argued that the amount of the award is not supported by any competent evidence.

Defendant is a Kansas corporation engaged in the business of manufacturing electric energy and transmitting the same over wires constructed for that purpose; and having procured authority therefor in February, 1931, condemned a right of way 60 feet wide through and across plaintiff's farm. The condemnation order authorized defendant to erect on this strip four steel towers, the bases being from 20 to 22 feet square, the height from 69 to 79 feet, con-

structed with galvanized steel, to which cross arms would be attached, from which transmission wires and conductors would be suspended at such a height as not to endanger the life or property of any person using the land under it for the passage of vehicles. It provided that defendant should have the exclusive easement upon only that part of the strip of land occupied by the steel towers, and should have the right to use this strip of land, with ingress and egress at the ends thereof, for the construction and maintenance of its towers, with cross arms and appurtenances attached, transmission lines and appliances, and have an easement above the ground over that part of the strip occupied by the transmission lines to transmit electric energy over the lines, and to clear all obstructions within the space so that the transmission lines would not be interrupted or interfered with. The plaintiff and his successors in interest at all times are entitled to use all the real estate, except that part covered by the towers, for all purposes which would not interfere with the construction, maintenance and operation of the transmission system.

Appraisers were appointed, who assessed damages, from which an appeal was taken to the district court, where there was a trial before a jury as to the amount of the damages.

In answer to special questions the jury stated that they had allowed nothing (1) for depreciation of plaintiff's land because of inconvenience in cultivating the same, (2) for unsightliness of the transmission line across his land, (3) for fear or possibility of growth of noxious weeds, (4) for fear or possibility of damage to machinery from running into ruts, (5) for fear or possibility of injury to crops, fences, or other property that will occur in the future, and in connection with the construction, maintenance and repair of the transmission line. Further answering special questions, the jury said they did allow damages not itemized in the previous questions, and on being asked "for what cause you allowed such damages," answered, "Damages to entire farm." The sum allowed was $2,810.

Plaintiff's farm contained 204 acres. The strip condemned across it was somewhat diagonal with the government surveyed land and was 3,211 feet long. Its area is 4.48 acres. The area of the four foundations occupied by the towers is .03 of an acre. The only part of the strip of land condemned which the defendant, by the condemnation proceedings, acquired the exclusive use of, was that part occupied by the towers. It had the right to enter or leave the land

at the ends of the strip for the purpose of constructing its towers, with their equipment, the right to transmit electric energy over the wires suspended from the towers, and to remove trees or other obstructions on the strip, the height of which might interfere with the transmission of the electric current. In all other respects plaintiff had the right to use this strip of land. He could use it for pasture or ordinary farming purposes, as he had previously done. Even the braces on the towers were high enough that teams and ordinary farm implements could pass under them without difficulty.

Because of this taking of plaintiff's property by defendant plaintiff was entitled to damages: First, for the full value of that part of the land the exclusive use of which was taken by defendant, being the area covered by the towers and their foundations. Second, damages because of the limitation placed upon his use of the property by the condemnation of the remainder of the strip, about 4.45 acres. Third, damages to his farm as a whole, if any, occasioned by the taking by defendant of the exclusive use of a part of the land in the strip, and a partial use of the remainder.

To establish his damage plaintiff testified, in substance, that the value of the 60-foot strip of land through his farm was $250 per acre; that the market value of the whole farm prior to the condemnation was $225 per acre, and after the condemnation $210 per acre. He had had no experience with land upon which steel transmission power lines had been constructed, although he had had experience with land upon which electric light lines had been constructed. At the time of the hearing in district court the towers and their foundations were being constructed on his land. He was asked on what he based his testimony as to the damages to the entire farm. He answered that he based it on the fact that his farm was cut in two by the transmission line and having a public highway through the middle of his farm. "They have got a road through my wheat field now ten or twelve feet wide, and my alfalfa field is all tramped down." He did not consider any of the strip of any value to him because defendant had a right to run over it whenever it pleased, and might do so in the future and destroy the crops and pack the soil so that it would not be good for farming. The strip goes through his hog pasture and sheep pasture. He took into consideration the fact that in the future defendant in going through his place along this strip might take the fences down, leave them down, and let the sheep or other stock get out; or, if gates were

there, they might be left open. Perhaps a prospective purchaser of the farm would object to the transmission line running through it. Defendant moved to strike out this evidence pertaining to the depreciation of the land as a whole because it is based upon elements of alleged damages which are too remote and speculative. In ruling upon the motion the court said:

"The value of a piece of land or property depends somewhat on the neighborhood that it is in and on the neighbors that a man has and whether or not they are neighbors that are disposed to respect his property rights or are not neighbors whom he could reasonably expect to respect his property rights. I think we may take those things into consideration, any person buying a piece of land, buying a home, the question of his neighbors; of course, there are other features to it—whether or not they are people that are naturally disposed to respect his property rights is something to be taken into consideration. Now the fact that he would have a remedy against them, we may say, doesn't necessarily determine it. A man doesn't want to start in to pursue a remedy against his neighbors for every trespass. I think that the evidence should stand."

Another witness testified that the value of the farm was $10 an acre less after the construction of the transmission line than before, for the reason that the farm "is cut cater-cornered in two"; the 60-foot strip is worthless to plaintiff because defendant had a right for a road on any part or all of it through the farm, and it would not be worth while for plaintiff to try to use it for any purpose; if he put out a crop defendant might come in with half a dozen trucks to fix the line and ruin the crop; then, if plaintiff wanted to sell, he had a cloud on his title and couldn't give a clear title, which he regarded as the greatest damage. . On motion to strike out this evidence as not being a proper basis for damage the court expressed the view that the cross-examination disclosed matters which went to the weight and credibility of the evidence, but as not being sufficient to exclude it.

Another witness thought the farm as a whole would be depreciated from $10 to $15 per acre. He farmed and handled stock, but had had no experience with land on which there was a steel electric transmission line. On being asked why the entire farm would be so depreciated he testified that the tract condemned cuts plaintiff's farm in two pieces and defendant has a right to go in there any time and leave the gates open, which would be a bad thing when one is handling stock; no one would give as much for the farm with this strip taken out diagonally across it belonging to defendant; his view was that the condemned strip belongs absolutely to defendant, which had the right to use that as it pleased; fellows might go

through there fishing or trespassing. If defendant did not have absolute ownership of the strip, but simply the right to construct its towers and put up the lines and go in to inspect them as was necessary, that would make no difference with the witness' view—he would prefer to have it fenced on each side. Defendant's motion to strike out the testimony of this witness in regard to the depreciation of the right of way taken, and of the land not taken, for the reason that it was based on improper elements and too remote and speculative, was overruled.

Another witness estimated the farm as being worth $15 less per acre after the construction of the transmission line than before. His basis for that estimate was the inconvenience, loss of time, and destroying of crops by attempting to farm around and near the towers; that the land, which it would be impossible or difficult to farm near the towers, would be a breeding place and a harbor for noxious weeds, injurious insects and rodents. He also thought there would be damage to the entire farm because defendant's men, in inspecting the line or maintaining it, might leave gates open or trample down fences, which would permit stock to get out, or horses to get cut or crippled on the wire; that trucks going through there to make repairs, if the ground were wet, would leave ruts, which would make it difficult to farm across and might break the machinery and cause a trip to the blacksmith shop. He also took into consideration the strip of land and thought it hardly worth while for one to undertake to farm it.

Another witness thought plaintiff's land outside of the strip was worth $14 per acre less after the construction of the line than before. He was in the real-estate business. He had had no experience in handling or selling lands upon which steel towers and transmission lines had been constructed. His idea was that anything in the way of an easement on land was detrimental to its sale. Because defendant had a right to use the strip to make a road through there stock might get out, and if sheep or cattle got on the alfalfa there might be loss. Trucks going through at a time when it was muddy might start a wash through the field, making a ditch, over which it would be difficult to farm. A motion to strike out the evidence of this witness for the reason his estimate was based on elements that were speculative and remote was overruled.

On behalf of defendant evidence was offered that the way the line would be constructed it would be unnecessary after it was com-

pleted to go in there often with trucks. It would be patrolled by a man on foot three times a year, and about the only damage that could come to it would be the breaking of glass insulators. Defendant offered to show in detail how it planned to construct this line, with photographs of similar lines previously constructed. The court excluded this evidence on the ground that defendant was not required to construct the line in any particular way except as it complied with the rights which it obtained by condemnation. Other witnesses, who had had experience as owners or farmers of land upon which steel-tower electric transmission lines had been constructed, testified that while there was some inconvenience in farming about the towers, the land could be cultivated to within a few feet of the towers; teams and ordinary farm implements might pass under them, and that the damage to the farm as a whole, by reason of this inconvenience, was negligible and would not amount to more than $160.

Defendant requested an instruction, among others, as follows:

"In determining appellant's damages, you can only consider elements which create a physical disturbance of a right of property; and you cannot consider as elements of damage the following detailed by the witnesses in this case: Opening fences to reach the transmission line; possible trespasses by the power company's employees resulting in damage to crops; unsightliness of the towers and transmission line; the assumption that the payment of taxes by the owner on the whole tract without abatement for the power company's limited use of the strip will depreciate the value of the land; fear of possibility of trespass upon appellant's property by others than the officers, agents or employees of the power company; fear that the power company employees might make ruts which would break the appellant's machinery when he was working across said strip; fear that the power company employees might make ruts which would start the appellant's field to wash; and fear that the appellant might lose a sale of said land because some purchaser would claim that the condemnation proceedings were a cloud on the title of appellant's land."

The court refused the instruction requested, and gave, among others, the following instructions:

"2. You are instructed that by said condemnation the defendant did not acquire title to the premises condemned, but acquired only an easement therein for the purposes heretofore mentioned, and upon abandonment of said premises for the purpose for which they were condemned, all rights therein would revert to the plaintiff.

"5. In determining the damages to the land not taken, you are instructed that you may consider the diminution of the market value thereof for any use for which it may reasonably be adapted, but such damages must be real and reasonably to be apprehended and such as the natural result from the

use of said right of way for the purposes for which it was condemned. In other words, it is such depreciation in the fair market value thereof as might reasonably be expected to result from the taking of said right of way.

"6. You are instructed that in determining the damage, if any, which the plaintiff has sustained to his land not taken, you are not permitted to take into consideration trespass upon said land by the defendant or any other persons, nor to take into consideration the failure of the defendant company to do anything in the care and maintenance of said right of way which it was its duty to do.

"7. The damages which the plaintiff is entitled to recover in this action are, first, the fair market value of the strip of land taken by the defendant for right of way, less the fair market value, if any, of the rights remaining in the plaintiff in said strip, and, second, the damage, if any, to the land not taken which the plaintiff suffered by reason of the taking of said right of way. You are instructed that the measure of this damage is the difference between the fair market value of such land immediately before the taking of said right of way and its fair market value after the taking of such right of way. These values you are to determine from a preponderance of the evidence. And you are instructed that you should not allow the plaintiff any damage to the land taken or to the land not taken except that which you arrive at on the basis of fair market value as herein directed."

In its first instruction the court stated in detail the extent of the easement condemned as the same was embodied in the order of condemnation, which was, in substance, that defendant had the exclusive use only of that portion of the land on which its towers were constructed; that it was required to place cross arms, transmission wires and conductors above the land at a height not to endanger the life or property of any person using the land in an ordinary manner; that it could use the strip of land, with ingress and egress at the ends thereof, for the construction of its line and for inspecting it and maintaining it after it was constructed, and that plaintiff had left to him the right to use all of the strip of land, except that covered by the towers and their foundations, for all purposes which do not interfere with the construction, maintenance and operation of the transmission system. The court also properly instructed the jury, in No. 2, that defendant did not acquire title to the premises condemned, but acquired only an easement thereon for the purposes mentioned, yet, in estimating damages to the farm as a whole, evidence was permitted to go to the jury, over defendant's objection, predicated upon the view that defendant acquired absolutely the 60-foot strip; that it "cut the farm in two," making two places out of it instead of one. Obviously this was erroneous.

With respect to the damages to plaintiff's land not in the strip,

the jury was told, in instruction No. 5, that the damages "must be real and reasonably to be apprehended and such as the natural result from the use of said right of way for the purposes for which it was condemned." That is an accurate general statement. In instruction No. 6 the court told the jury that in determining that item "you are not permitted to take into consideration trespass upon said land by the defendant or any other persons, nor to take into consideration the failure of the defendant company to do anything in the care and maintenance of said right of way which it was its duty to do." In view of the testimony which the court permitted to go to the jury, the limitations upon the matters which the jury should take into consideration should have been made much more specific. Substantially the instruction requested by defendant should have been given, although possibly it contained an item with respect to taxes not testified to by any witness and which, in view of that, should have been omitted. The court had permitted to go to the jury, with a comment which clearly indicated it deemed the evidence proper, testimony of supposed damages which might result in the future if defendant's employees should break down fences or leave gates open, over which stock would stray or receive injury; or that in the future crops on the strip of land might be injured or damaged by defendant's employees going in there to inspect or maintain the line; or that the land itself might be damaged by reason of cuts made by trucks from which ruts might form, or other damages result. These are not proper elements to be taken into consideration. In *Love v. Empire Natural Gas Co.*, 119 Kan. 374, 239 Pac. 766, it was held:

"If an unreasonable use of the land is made in the inspection and maintenance of the pipe line after it is installed, the landowner will be entitled to recover the damages so occasioned."

And in the opinion it was said:

"Plaintiff urges that in inspecting the line and making repairs his cattle will be frightened and land injured in hauling material for repairs over it. If the action of the company in entering his land for inspection and maintenance should damage fences, unreasonably cut the ground or injure cattle or crops, it would be liable to plaintiff for such injuries, and the one who suffers the injury can recover for the damages so occasioned." (p. 379.)

It was error to admit this evidence as a basis for damages to the entire farm. In 20 C. J. 778 the rule is thus stated:

"In proceedings to condemn land, . . . no damages are included except

such as necessarily arise from a lawful taking and a proper construction and operation of the improvement. Anticipated or past negligence in the construction of the improvement is not therefore an element of damage. . . ." (Citing many authorities.)

Following this rule, it has been held in many cases that damages to crops, fences and to the land while constructing the improvements are not proper elements of damage in a condemnation proceeding, but should be recovered in a separate action for damages. On the other hand, and perhaps the better view is, that if the trial of the question of damages is had after the construction of the improvement (in this case erecting the towers and placing thereon the equipment, including the transmission wires), damages to fences, crops or land made in the progress of those improvements may be recovered, since they flow out of the condemnation, and to permit it to be done at that stage of the procedure avoids an extra action. (*Penney v. Commonwealth*, 173 Mass. 507, 53 N. E. 865; *Watts v. Norfolk & W. R. Co.*, 39 W. Va. 196, 19 S. E. 521.) The point is not specifically raised here and we mention it only because of the fact that the record discloses that at the time of the trial in the district court the transmission line was in process of construction, and perhaps by the time of a new trial, which it will be necessary to order in this case, it will have been completed; so any damages of this character resulting from the construction of the line itself may be taken into consideration.

The court permitted evidence to go to the jury, over defendant's objection, to the effect that the price of the farm as a whole would be decreased because some prospective purchasers would object to any kind of an easement on land they purchased and object generally to the presence of the transmission line. From one of the witnesses, at least, this was based largely upon his view that the defendant had this entire strip of ground, with the right to enter it at any time in the future and cause damage to fences, crops and the land without being required to respond in damages therefor. As we have heretofore seen, this is a fallacious view and one which should not have been permitted to go to the jury. Aside from that, the idea that some prospective purchaser might object to the presence of the transmission line, or the fact that an easement of any character was across the place, are too remote and speculative to form the basis of substantial damages. Now, more than formerly,

transmission lines similar to this are being constructed generally throughout the country, not only across lands, but along highways and through city streets and alleys, without any diminution of property values by reason of their proximity.

The only evidence in the record that would support any damages to the farm as a whole was that which related to the inconvenience of the farm operations by reason of the towers and the fact that it would take a little more time to work around them than if they were not there; the fact that there would be a waste in productiveness of the land for a small area about the towers, some injury or damage to crops by reason of the necessity of turning teams or implements near the towers, and the fact that the areas near the towers would be breeding or harboring places for noxious weeds, insects or rodents. But the jury, in answer to special questions, stated they allowed nothing for those things; hence there is no evidence in this record to sustain a judgment for plaintiff for damages to his farm outside of the strip taken by the condemnation proceedings.

In the seventh instruction the court placed the damages which plaintiff was entitled to recover in two classes: First, the fair market value of the strip of land taken, less the value, if any, of the rights remaining to the plaintiff in the strip; second, to the farm as a whole. While in a sense this was accurate, it was rather a backhanded way of saying it. With less confusion, it seems to us, the court might have said that plaintiff was entitled, first, to full compensation for that part of the strip to which defendant acquired the exclusive easement by reason of the condemnation proceeding, being the part covered by the towers and their foundations; and, second, for damages to the remainder of the strip by the partial taking provided by the condemnation proceeding; and, third, for damages, if any, to the land not taken.

Defendant complains because the court excluded evidence of witnesses as to just how the line was to be constructed and maintained. This evidence should have been admitted. It was excluded upon the theory that defendant was bound by the order of condemnation. That order had not been admitted in evidence, and while the court gave the substance of it in its instructions, it would have been proper for the jury to have had the testimony. The evidence offered did not show the construction of a line at variance with the order, but

in harmony with it, and with this evidence before them the jurors would have had a more complete picture of the use to which the order of condemnation permitted defendant to make of the property.

Appellant complains of the refusal to give instructions requested and of the instructions given. We have sufficiently commented on that.

The views here expressed are supported by several decisions of the supreme court of Illinois, of which the latest is *Rockford Electric Co. v. Browman,* 339 Ill. 212, 171 N. E. 189; also by *Alabama Power Company v. Keystone Lime Company,* 191 Ala. 58, 67 So. 833; *Missouri Power & Light Co. v. Creed,* 32 S. W. 2d 783 (Mo. App.); *Coast Counties Gas & Electric Co. v. Miller & Lux,* 5 Pac. 2d 34 (Cal. App.), and are in harmony with our own case of *Yagel v. Kansas Gas & Electric Co.,* 131 Kan. 267, 291 Pac. 768, and cases there cited. We are aware some decisions are not in complete harmony with those above cited. We have examined some of those cases and are satisfied with the views here expressed.

It is clear that the verdict in this case was excessive, and that its excessiveness was due to improper evidence received, to the refusal of the court to permit defendants to show the actual manner of the construction and maintenance of the line, and to the instructions given. The result is, the judgment of the court below must be reversed and a new trial granted.

It is so ordered.

BURCH, J., not sitting.