UNITED STATES of America ex rel.
TENNESSEE VALLEY AUTHOR-
ITY, Plaintiff-Appellee,

v.

An EASEMENT AND RIGHT OF WAY
OVER LAND IN LOGAN COUNTY,
KENTUCKY, Enlow Rogers, et ux., De-
fendants-Appellants.

No. 15342.

United States Court of Appeals
Sixth Circuit.

Aug. 27, 1964.

J. Granville Clark, Russellville, Ky., for appellants.

Thomas A. Pedersen, Asst. Gen. Counsel, Tennessee Valley Authority, Knoxville, Tenn., Charles J. McCarthy, General Counsel, Tennessee Valley Authority, Knoxville, Tenn., John C. Lovett, Benton, Ky., William W. Hurst, Knoxville, Tenn., on brief, for appellee.

Before CECIL and O'SULLIVAN, Circuit Judges, and McALLISTER, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

Defendants-Appellants, Enlow Rogers, and wife, appeal from a judgment fixing the compensation to be paid for the taking, by the Tennessee Valley Authority, of an easement and right of way across their farm in Logan County, Kentucky. This judgment was entered by three United States District Judges, convened under the provisions of the Tennessee Valley Authority Act of 1933, Title 16 U.S.C.A. § 831x. Appellants make two contentions; first, that the TVA had no authority to take their property, and second, that the award of compensation was inadequate. Appellee, TVA, asserts that the award was excessive.

We are first met with the question of whether the claimed invalidity of the taking by TVA is properly before us. To answer this, it is necessary to review the procedural steps involved.

1) *Procedure.*

On August 31, 1961, Tennessee Valley Authority filed a Complaint in the District Court asking, first, that an order be entered putting it into possession of the property being condemned, (40 U.S.C.A. § 258a); second, that Commissioners be appointed to assess the compensation to be paid, (16 U.S.C.A. § 831x); and, third, that judgment be entered confirming the vesting of title to the condemned property in the United States. Contemporaneous with filing its Complaint, TVA filed its Declaration of Taking and deposited therewith the sum of $1,800.00 as its estimate of the compensation to be paid. On September 8, 1961, an order was entered by the District Court, putting the TVA into immediate possession of the property to be taken. This was followed on September 9, 1961, by an order appointing Commissioners to assess the compensation to be paid. On September 16, 1961, defendants filed a motion for the vacation of the order of taking and dismissal of the complaint. Among other grounds for dismissal, defendants' motion avers, in substance, that the allegations of the Complaint and the Declaration of Taking fail to disclose that the taking was for a use for which the TVA is authorized to exercise its power of eminent domain. The only description of TVA's intended use of the property is the following allegation of the Complaint:

"The use for which the property is taken is the construction, operation, and maintenance of a portion of an electric power transmission line, designated by the Tennessee Valley Authority as the Paradise-North Nashville No. 1 (East) Transmission Line."

and a like statement in the Declaration of Taking. The Complaint avers that the authority for the taking "is the Tennessee Valley Authority Act of 1933, 48 Stat. 58, as amended, 16 U.S.C. §§ 831–831dd (1958; Supp. I, 1959)." The pleadings contain no allegation that what is to happen on the Paradise-North Nashville No. 1 (East) Transmission Line is in any way related to the purposes for which Congress created the Tennessee Valley Authority.[1]

1. "For the purpose of maintaining and operating the properties now owned by the United States in the vicinity of Muscle Shoals, Alabama, in the interest of the national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins, there is created a body corporate by the name of the 'Tennessee Valley Authority'. * * * " (Tennessee Valley Authority Act of 1933, § 1, 48 Stat. 58; Title 16 U.S.C.A. § 831.)

On November 13, 1961, the District Judge heard arguments on defendants' motion to dismiss and reserved his ruling thereon. On March 8, 1962, the Commissioners, having met and heard testimony relevant to the subject, awarded Rogers $6,300.00 as compensation for the taking involved. TVA filed exceptions to the award. On April 13, 1962, the District Judge denied defendants' motion to dismiss. On April 17, 1962, conforming to the procedure outlined by 16 U.S.C.A. § 831x, the District Judge designated three District Judges to hear the exceptions to the Commissioners' award. Upon the convening of such three-judge court, both parties declined to offer further evidence and the matter was submitted to such court upon a transcript of the testimony taken before the statutory Commissioners, and upon such judges' own study and view of defendants' premises. After such de novo hearing (16 U.S.C.A. § 831x) and on December 22, 1962, the said three-judge District Court rendered its Award and Judgment, assessing the compensation to be paid to defendants at a total of $4,300.00, a reduction of $2,000.00 from the amount awarded by the statutory Commissioners. The judgment thus entered does not purport to pass upon the right of TVA to take defendants' property.

On January 17, 1963, defendants filed their Notice of Appeal "from the final judgment of [the] United States District Court * * * composed of three Federal District Judges, entered in this action on 22nd December, 1962." Such appeal is provided for by Section 25 of the Tennessee Valley Authority Act (16 U.S.C.A. § 831x) and relates only to the award of compensation. It does not bring before us the District Judge's denial of defendants' motion to dismiss, made on the grounds that TVA was without authority to take defendants' property. No final appealable order or judgment has as yet been entered on that point. Catlin v. United States, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911.

Notwithstanding the foregoing, appellants' brief, as a question involved, presents the following:

"Does TVA have authority to construct a steam plant and run transmission lines to areas outside of the Tennessee River Valley or its tributaries?"

Appellee's brief avers that "no final judgment has been entered and appellants have not appealed from the interlocutory order of April 13, 1962." (Denial of the motion to dismiss.) Both briefs then proceed to argue the question of TVA's authority to take appellants' property. Even though acceptance of this joint invitation to now decide such question might save further litigation, we decline to do so on the record brought to us.

The total information supplied by the allegations in the complaint and some testimony given by a TVA employee at the hearing on compensation, is that TVA is constructing, or has already constructed, a so-called steam plant at a place called Paradise, there to generate electricity to be supplied to Nashville, Tennessee, and, in the future, to other places; that this plant is within 85 miles of the Kentucky Dam, a TVA facility located on the Kentucky River; that the "transmission distance" from the latter is 1,000 miles; that the Paradise plant is within an area already served by TVA. We are not advised as to whether the Paradise plant is connected with, auxiliary to, or aids the distribution of electricity generated at any TVA hydro-electric plant. It is not clear to us whether TVA is here contending that it has authority to construct a steam plant at any place within 1,000 miles of one of its admittedly authorized hydro-electric plants, and therefrom distribute electricity.

TVA argues that Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688; United States ex rel. TVA v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843; Rainbow Realty Co. v. Tennessee Valley Authority, 124 F.Supp. 436 (M.D.Tenn.1954); United

States ex rel. TVA v. Puryear, 105 F. Supp. 534 (W.D.Ky.1952) have announced law that clearly supports its assertion of authority for the taking in this case. Further evidence may, indeed, establish that "Paradise-North Nashville No. 1 (East) Transmission Line" serves an authorized TVA purpose. We are not satisfied, however, that we should undertake decision of the question on the meager record before us. For further consideration and final judgment in this regard, the cause is remanded to the District Court.

### 2) *Amount of compensation.*

TVA deposited $1,800.00 as its estimate of adequate compensation for the taking of an easement and right of way across appellants' 536 acre farm. The Commissioners awarded $6,300.00 and the three-judge District Court awarded $4,300.00. On this appeal, appellant Rogers asks us to fix his compensation at $26,800.00, and TVA asks us to fix it at $1,800.00. The prescribed procedure, peculiar to condemnation by TVA, directs that the three-judge District Court "shall pass de novo upon the proceedings had before the commissioners, may view the property, and may take additional evidence." (16 U.S.C.A. § 831x). The same section provides that upon appeal to us, we shall "dispose of the same upon the record, *without regard to the awards or findings theretofore made by the commissioners or the district judges*, and such court of appeals shall thereupon *fix the value of the said property* sought to be condemned." (Emphasis supplied.)

For discharge of our responsibility we have before us 161 pages of appendices, a transcript of 270 pages, some photographs of appellants' farm and some maps delineating the course of the right of way. TVA has constructed four towers thereon to carry its transmission lines. There are two sections to the right of way; one, identified as PNE 135, extending 2743 feet, and the other, PNE 137, extending 1565 feet across sections of appellants' farm. The right of way is 150 feet wide. The distance from appellant Rogers' home to the center of the nearest tower is 660 feet and from Rogers' home to the center line of the right of way at the nearest point is 537 feet. The base of each tower is 24 feet square, and the towers range from 60 to 80 feet in height. The total acreage included in the right of way is 14.9 acres—9.5 acres in Tract 135 and 5.4 acres in Tract 137. Some trees in a windbreak were removed in installing the towers and transmission lines. Appellants will be totally dispossessed only of that part of the land occupied by the tower bases, subject to TVA's right to

"enter and to erect, maintain, repair, rebuild, operate and patrol one line of poles or transmission line structures * * * for electric power circuits and telephone circuits * * * together with the right to clear said right of way and keep the same clear of brush, trees, buildings, and fire hazards, and to remove danger trees, if any, located beyond the limits of said right of way, the plaintiff [TVA] to remain liable for any direct physical damage to the land, crops, fruit trees, fences and roads, resulting directly from the operations of the construction and maintenance forces of plaintiff and about the erection and maintenance thereof. * * * "

In addition to deprivation of free use of the acreage within the right of way, appellants Rogers assert that the value of their entire farm has been lessened through loss of aesthetic value, impairment of facility in farming operations, inability to carry on crop spraying, loss of market value because of a public fear of high tension wires, and the danger inherent in power lines and towers. Appellants claim that removal of trees from the windbreak lessened its usefulness. In such claims, appellants were supported by their witnesses, all of whom joined in an estimate that there was an overall loss of value of not less than $50.00 per acre in the market value of appellants' 536 acres, thus totalling $26,800.00.

TVA witnesses countered these claims, asserting that its installations did not detract aesthetically from the farm; they discounted the claimed danger from the towers and transmission lines; one admitted fear of these installations, while others dismissed public fear as affecting the value of the farm; they asserted that the impairment of the windbreak was minimal. The opposing witnesses disagreed as to the market value of appellants' farm. The TVA witnesses came to a final conclusion that $1,800.00 was fair compensation for the taking of the easement.

■■ Neither the Commissioners nor the three-judge District Court disclosed by opinion or otherwise the formulae, if any, that they employed to arrive at their awards of $6,300.00 and $4,300.00, respectively. We do not have the benefit of their views as to the weight of the evidence or the credibility of the witnesses. It is obvious, however, that both factfinders, Commissioners and District Judges, gave greater weight to TVA's witnesses and were not impressed with the appellants' and their witnesses' estimates of the loss. The District Judges viewed the premises with its buildings and the towers and transmission lines already constructed thereon. In addition to their own knowledgeability as Kentucky judges, they read the testimony of qualified witnesses who testified before the Commissioners. While the statute involved tells us to "fix the value" of the condemned property "without regard to the awards or findings * * * made by the * * * district judges" we may consult their expressed judgment to aid us in coming to our own conclusion, giving consideration "to the special advantages of the tribunals below in evaluating the evidence." United States ex rel. TVA v. Powelson, 319 U. S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, 1396; United States ex rel. TVA v. Brandon, 153 F.2d 781 (CA 6, 1946). Thus aided, and upon our own reading and evaluation of the testimony, and examination of the pictorial exhibits, we conclude that $4,300.00, the amount awarded by the District Judges, is fair compensation to appellants for the taking of the easement.

Judge McAllister's able dissent suggests that the factfinders may have allowed nothing for the impairment of the aesthetic value of the property involved. With great respect for its excellent exposition of his view, we believe that the factfinders did consider aesthetic loss. True, the TVA witnesses gave their opinions that the power lines and towers did not constitute aesthetic detriments and on this appeal TVA persists in such position and asks us to reduce the award to $1,800.00. This was the highest figure given by its witnesses for the damage, without allowance for aesthetic loss, but neither the Commissioners nor the District Judges accepted this position. Neither do we. The award of $4,300.00 approved by us exceeds the $1,800.00 by only $2,500.00. We are satisfied, however, from our review of the record before us, including the view of the premises by the three Kentucky District Judges and their evaluation of the aesthetic considerations, that the total award was adequate.

■ We do not believe that the District Judges or this Court must accept the estimate made by the witnesses produced by Rogers because the TVA witnesses gave no estimate of aesthetic loss. The $50.00 per acre minimum figure which Rogers' witnesses gave for the loss included all damage to the farm without specification of what portion thereof represented aesthetic loss. Neither the District Judges nor this Court are put to the choice of allowing nothing for aesthetic loss or accepting the Rogers testimony as the only yardstick for evaluation. We are at liberty to form our own judgment as to the total loss of aesthetic value from all the material before us, as were the District Judges. We are unable to accept as realistic the estimates of Rogers' witnesses as to the dollar value of his aesthetic loss.

We join our brother in decrying the ugliness being intruded into America's

pastoral beauty by today's rushing pursuit of economic gain. We do not, however, equate these tall towers extending into the distance with the commercial disfigurements that border our highways.

Upon our own judgment, we fix the amount to be awarded at $4,300.00. It is so ordered.

McALLISTER, Senior Circuit Judge (dissenting).

I concur in Judge O'Sullivan's view that the record is too meager to determine whether TVA has the authority, in the circumstances of this case, to take appellants' property, and that the case should be remanded for further proof as to whether the transmission lines in question serve an authorized TVA purpose.

However, I am unable to concur in the affirmance of the determination of the amount of $4,300 as the fair compensation for the taking of the right-of-way for the transmission lines and towers erected on appellants' property. As Judge O'Sullivan observed in his opinion, it is obvious that the factfinders gave greater weight to TVA's witnesses, and were not impressed with appellants', and their witnesses', estimation of the loss. Inasmuch as the case is to be remanded for further proofs as to whether the taking of appellants' property served an authorized TVA purpose, I would also, if the Act permitted, remand for specific findings as to the damage to the aesthetic value of the land which appellants suffered because of the condemnation, provided, as above stated, it is found that the transmission lines in question serve an authorized TVA purpose. However, there is no authority given in the Act for a remand for the filing of specific findings. The Act provides that on appeal, the court "shall dispose of the same, without regard to the awards or findings made by the commissioners or district judges, and such court of appeals shall thereupon fix the value of the said property sought to be condemned." I, therefore, would fix the value of the said property sought to be condemned, on the evidence heretofore submitted.

The farm in question, on which the four towers were erected and over which are carried the power transmission cables, has an area of 536 acres. It is admitted that it is one of the most beautiful farms in Kentucky—a land of some of the most beautiful countryside in the world—and is described by all witnesses as a show place. Not only is it a show place, but, according to one of the real estate experts engaged in selling some of the fine farms in the vicinity, appellants' farm is better than the land in the Blue Grass region of Kentucky. It consists also of some of the richest land in the nation, producing over 100 bushels of corn per acre. The real estate expert, who testified to the foregoing, was a man who received no payment of fees as an expert witness. He further testified that the beauty of the farm is an important factor to be considered in determining its value.

The four towers erected on appellants' farm by the TVA are each 25 feet square at the base, and 60 to 80 feet high. They carry electric transmission cables, strung in mid-air, for a distance of 4,318 feet across appellants' land. These are huge cage-like structures, slightly narrower at mid-height than at the base, but again widening out at the top, larger than at the base. The electric power transmission cables are attached to each tower. The right-of-way is 150 feet wide. The distance from appellants' barns to the electric transmission lines is 240 feet, and they cross the land 537 feet from appellants' home, the nearest tower being located 660 feet from their home. The TVA also cut down a windbreak of trees on the northwest boundary of appellants' land, consisting, among other trees and bushes, of a large oak tree 30 inches in diameter, 8 cedar trees, approximately 10 inches in diameter, a cherry tree, approximately 10 inches in diameter, and approximately 25 other oak trees 6 to 12 inches in diameter. There was an abundance of evidence that the farm was worth much less with the towers and

transmission lines, and that its beauty had been marred by the erection of these structures—that they were unsightly things and "would decrease the value of the show place definitely."

The principal TVA witness, Mr. Ray A. Robinson, testified as an expert in real estate values. He placed a total value on the farm of $137,200. This contrasted with appellants' testimony of value of $214,400. Appellants had been offered $168,800 for this farm five years before the date of the hearing, and refused the offer. One witness, a willing purchaser, testified that he was ready and able to pay $400 an acre for the farm—or $214,-400, but that the towers and transmission lines reduce its value by $100 an acre—or by $53,600. The undisputed evidence was to the effect that the value of all land in this vicinity had been increasing during the past five years.

A number of real estate witnesses placed the value of the land at $187,600, or $350 an acre. Government witnesses, starting with Mr. Robinson, as heretofore stated, placed the value of the farm at $137,200, and other government witnesses testified to lower amounts; and one government witness testified that the farm was worth $37,200 less than the value placed on it by the government's chief witness, or $100,000. Mr. Robinson, the government's chief witness on value, testified that he allowed nothing for damage to aesthetic value of the farm, by reason of the erection of the large electric towers and transmission lines across the property. He did not think it marred the beauty of the place. He did not think the land had any aesthetic value. He didn't think the towers were ugly, and said "some people think they are pretty." It would not bother him if one of the towers were erected in his own yard, as he would just as soon look at it every morning. Another TVA witness on land values testified, when asked on cross-examination, whether the towers and cables affected the beauty of the place, that "it didn't hurt the beauty of the farm in my opinion." All of the foregoing is representative of the testimony of the government witnesses on the value of the property—that the four large towers and the transmission lines did not in any way mar the beauty of the place—and that the land had no aesthetic value; and, consequently, the TVA expert witnesses on land value did not consider any damage to aesthetic value.

Another witness, Mr. Earl V. Davis, a former lieutenant colonel in the Army, a banker of approximately twenty-five years experience, and a man who knew land values thereabout, gave it as his opinion that the towers and transmission lines crossing this "showplace" farm, reduced its value by $50 per acre. He stated that "we usually refer to the south end of Logan County as the best farm land in Kentucky, and we usually say the best in the world." Dr. W. L. Harris, a surgeon, who already owned 475 acres near appellants' farm, and who had offered appellants $300 an acre for their farm, said he would pay $500 an acre for the place "before sundown * * * if Production Credit will back me." Dr. Harris testified the damage to appellants' land, resulting from the erection of the towers and transmission lines, amounted to at least $50 an acre. Another expert witness in real estate, Marshall Ryan, testified to the same effect. Archie Simmons and Sterling Markham, from the vicinity, who knew fine farms, testified that the damage resulting from the erection of these towers and transmission lines would amount to $50 an acre.

For the easement of the land for the towers and transmission lines, the Government contended that the value of all damage resulting therefrom to appellants' farm was $1,800. The Commissioners appointed under the TVA Act awarded $6,300 as damages. Thereafter, conforming to procedure under the TVA Act, on denial of appellants' motion to dismiss, and exceptions to the award, filed by the TVA, the District Judge appointed three District Judges to hear the exceptions; and no further evidence being adduced, the case was submitted, and three District Judges, upon a study

of the testimony, and a view of the land in question, reduced the amount awarded by the Commissioners by $2,000, and awarded appellants the total amount of $4,300 as damages.

On appeal, appellants ask that the amount of damage they suffered from the towers and transmission lines be set at $50 an acre; and the witnesses, called by them, testified that the least damage to the land was $50 an acre, or $26,800 to the entire farm. The TVA insists that the compensation should be only $1,800.

This court, on appeal, is directed by the Act to dispose of the controversy without regard to awards or findings theretofore made by the Commissioners or the District Judges, and to fix the value of the property sought to be condemned. I again revert to Judge O'Sullivan's opinion, in which he says "that both fact-finders, Commissioners and District Judges gave greater weight to TVA's witnesses and were not impressed with the appellants' and their witnesses' estimates of the loss." The testimony of all the government witnesses was that the land had no aesthetic value, and they did not consider aesthetic value or make any allowance for the damage thereto. The Government argued on appeal "that the evidence as to 'unsightliness' of the line is too nebulous and speculative to support an award." The Government further, obviously and properly, assumes, from the award, that no allowance was made by the District Judges for damages to aesthetic value when, in its brief on appeal, it says:

> "The Government contends that the mere 'unsightliness' of the towers will not support an award for damages unless it can be coupled with testimony to the effect that the so-called 'unsightliness' has in fact affected market values. While we concede that there is a split of authority, we respectfully submit that the weight of authority and the better reasoned cases are to the effect that this is not a proper element of damage because it enters into the realm of speculation.[9] Since the

"9. East St. Louis Light & Power Co. v. Cohen, 333 Ill. 218, 164 N.E. 182 (1928); Illinois Power & Light Corp. v. Barnett, 338 Ill. 499, 170 N.E. 717 (1930); Salt River Rural Elec. Co-op. Corp. v. Thurman, 275 S.W.2d 780 (Ky.1955); United Power & Light Corp. of Kan. v. Murphy, 135 Kan. 100, 9 P.2d 658 (Kan. 1932); Kamo Elec. Co-op. v. Baker, 274 S.W.2d 497 (Mo.App.1954); Illinois Power & Light Corp. v. Peterson, 322 Ill. 342, 153 N.E. 577, 49 A.L.R. 692 (1926); Cf. East Ky. Rural Elec. Co-op. Corp. v. Phelps, 275 S.W.2d 592 (Ky. 1955); Rose Island Co. v. United States, 46 F.2d 802 (W.D.Ky.1930).

present case involves land in Kentucky, the observation made by the Kentucky court in the case of Salt River Rural Elec. Co-op. Corp. v. Thurman, 275 S.W.2d 780 (Ky. 1955), is of some significance:

> " 'Since the advent of rural electrification, many farms have transmission lines traversing them and instead of being unsightly, many prospective buyers of farms regard them as evidence that an abundance of electric power is manifest [p. 782].'
>
> "The court held that there must be some reasonable basis given by a witness upon which to rest an estimate of damages and that unless the testimony is based on sufficient facts it has no probative force.
>
> "Where would these trials lead if the principal issue and main element of incidental damages should turn on the question of aesthetics? The complete lack of factual foundation for testimony relating to unsightliness, the ease with which it can be manufactured, and the utter absence of standards by which to measure it, are but some of the factors which illustrate the unreliability of such evidence as forming a basis for awarding damages. The present case illustrates the basic fallacy of allowing damages to be awarded on such a basis. All of the witnesses for appellants testified that the entire Rogers farm consisting of 536

acres, was depreciated $50 an acre because of this power line. Yet common sense would dictate that such damage could not be uniform and affect every acre of the farm in the same amount. In Tennessee Gas & Transmission Co. v. Zirjacks, 244 S.W.2d 837 (Tex.Civ.App.1951), the court held that it was not sufficient for a witness merely to say that the entire farm was worth so much an acre before the taking and so much an acre after the taking without some showing as to why the damage would be uniform throughout the portion not included in the easement area."

Obviously, the award was in keeping with the government's claim as to what the law was, and in keeping with the testimony of the government witnesses, except that instead of $1,800 as the award, the three District Judges increased this by $2,500—whether as additional damages for the actual taking of the land for the easement, or as incidental damage is unspecified and unknown.

It is to be observed, in passing, that there was ample testimony that the unsightliness of the towers and transmission lines had, in fact, affected the market value of the property in question. The foregoing declaration of the Government, that there was no damage to aesthetic value, confirms what was recently said by Senator Harrison A. Williams, Jr. of New Jersey, who, when speaking in the United States Senate, stated "that the Federal Government, directly and indirectly, through the laws it writes, the programs it enacts and the regulations it issues, has contributed more than its share to the ugliness of the landscape— largely through apathy, neglect and negative restraint." (Congressional Record, October 4, 1962.)

However, contrary to the government's contention that aesthetic value has no place as a factor in damages, this court has held in Hicks v. United States, for the Use of T. V. A., 6 Cir., 266 F.2d 515, 521:

"The land was conceded to be a beautiful property. The damage done to the residue of the land over and above the easement strip included damage to esthetic values. See Ohio Public Service Company v. Dehring, 34 Ohio App. 532, 172 N.E. 448, which held that the unsightliness of towers and transmission lines may be considered in the award of damages for taking of farm land for a right of way for power lines, as unsightliness might affect the value of the land. Texas Power & Light Company v. Jones, Tex.Civ.App., 293 S.W. 885. Cf. Fain v. United States ex rel. Tennessee Valley Authority, 6 Cir., supra, 145 F.2d 958."

In the cited case, where the TVA expert witnesses testified that the damage to property, aggregating 129 acres, caused by the erection of towers and transmission lines, amounted to only $2,600 or $2,900, and the District Court made an award of $7,500, this court, on appeal, raised the amount of the award to $15,090 for 113 acres, after 16.4 acres of bottom land had been deducted from the property damaged.

As to the government's contention that it is not sufficient for a witness merely to say that the entire farm was worth so much an acre before the taking, and so much an acre after the taking, without some showing as to why the damage would be uniform throughout the portion not included in the easement area. This court, in Hicks v. United States, for the Use of T. V. A. supra, held that the allowance of a certain sum per acre was a fair allowance regardless of whether such acreage was included in the easement area. This farm as a show place should have been considered as a whole, before and after the taking, and it is not necessary to show the effect of such taking on each separate acre.

The law, in its expanding nature, applies rules of damages to property, in our crowded civilization, that were not considered as necessary by the public and the courts in days before invasion of privacy was thought to warrant damages, or child labor, to be a matter in

which the public interest was involved. Noise, crowded conditions, and injury to aesthetic value of property, have found remedies in injunctive relief, zoning laws, and damages; and, at the present time, citizens are becoming more concerned than ever before in our history with these assaults upon health, quiet, and the beauty of farms, homes, communities, and the American countryside.[1]

4. President Lyndon B. Johnson, in speaking at the Commencement exercises at the University of Michigan, on May 22, 1964, said:

"I want to talk to you today about three places where we can begin to build the Great Society—in our cities, in our countryside and in our classrooms. * * * The catalogue of ills is long: There is the decay of the centers and the despoiling of the suburbs. * * * Open land is vanishing. * * * A second place where we begin to build the Great Society is in our countryside. We have always prided ourselves on being not only America, the strong, and America, the free, but America, the beautiful. Today that beauty is in danger.

"The water we drink, the food we eat, the very air we breathe, are threatened with pollution. Our parks are overcrowded, and our seashore overburdened. Green fields and dense forests are disappearing.

"A few years ago we were concerned about the Ugly American. Today we must act to prevent an Ugly America. For once the battle is lost, once our natural splendor is destroyed, it can never be recaptured.

"And once man can no longer walk with beauty or wonder at nature, his spirit will wither and his sustenance be wasted."

In The Atlantic Monthly of May, 1964, Edward Weeks, distinguished editor and man of letters, writes:

"Of all experts, Army Engineers, state highway engineers, engineers in the Bureau of Reclamation stand in my mind as the most powerful, efficient, and ruthless. Their estimates are based on economy, and for this we respect them. We would respect them the more if in their planning they showed some consideration for the nation's heritage. The best throughway is a wind tunnel and water culvert cleaving woods and hills with a mania rivaling our love for speed. * * *

"In THE LAST REDWOODS (Sierra Club) * * * PHILIP HYDE and FRANCOIS LEYDET have told in photographs and text a fighting story. The photographs, some in color, are of forests so unbelievably beautiful that they make a man catch his breath. But these pictures of California enchantment —for California is the last great stronghold of this national treasure—could be a memorial. Now the last and finest of the Coast redwoods in the great watershed north of San Francisco are about to be subdivided by the state highway engineers in defiance of all that has been given to save the redwoods and in defiance of common sense. Highways, it seems, have a prior claim, and those who build them can destroy any trust.

"'As timber the Redwood is too good to live,' wrote John Muir, and how true those bitter words have proved to be. The National Tribute Grove, so beautifully illustrated in this book, consists today of five thousand acres, at the northern end of the state, protected 'in perpetuity' as part of the Jedediah Smith Redwoods State Park. The state engineers argue that they are not planning to cut down the entire grove, merely a swath through it about a mile long removing 'only a few of the trees.' Sure, sure. We have heard that same argument again and again in the East, and we have seen what the wind tunnels on Route 128 did to the unprotected stands of Cathedral pine in Essex County, and how the pine, maple, and hardwood have been thumbed down along the Connecticut River. There might have been alternate routes which would have saved the woods, but the engineers' ideal is a route that cleaves, without any curve or deviation to protect the past.

"The Last Redwoods in a poignant, infuriating record of American impatience. Here, in pictures like that of the 'Malarkey Forest' near Crescent City, is the shocking callousness with which lumbermen will terminate a chain of life going back farther than any other race of trees. The first positive identification of redwood fossils dates back some 130 million years, but the trees which had once reigned from the Black Sea to Greenland had to retreat before the glaciers; in time the species was reduced to two, and in time the last stand of the great monarchs, such as the Big Tree, which stood for four thousand years, was confined to California—and this is what the highway engineers will willingly disperse for a throughway. 'If ever there were gods of trees, here they stand,' and I suppose we should count ourselves lucky to have seen such giants, lucky to

In sum, it is undisputed that appellants' farm was a show place—one of the most beautiful farms in Kentucky. Of all places, Kentucky is famous, not only in this country, but internationally, for the beauty of its farms. To testify that such a place as appellants' farm has no aesthetic value is incredible, as is testimony that four great cage-like electric towers, approximately 24 feet square and 60 to 80 feet high erected on the farm and carrying electric transmission cables 4,318 feet across the property, are really "pretty" and do not affect the beauty of this show place.

All the government witnesses testified that the place had no aesthetic value; that the four towers and transmission lines did not mar the beauty of the place, which was contrary to the holding of this court in Hicks v. United States, for the Use of T. V. A. supra, where this question was passed upon and decided against the contention now advanced by appellee. The government counsel in its presentation of the case, insisted that damage to aesthetic value "is too nebulous and speculative to support an award," and that the "present case illustrates the basic fallacy of allowing damages to be awarded on such a basis." These contentions are directly contrary to the holding of this court.

The great weight of the testimony of the witnesses *who considered damage to the aesthetic value of this land,* was that such damage amounted to $50 per acre, or $26,800. This was the least amount of damage testified to by such witnesses; some testified that it was more. There was no contradictory testimony *by any witness who considered damage to aesthetic value.* In Hicks v. United States, for the Use of T. V. A. supra, the TVA witnesses testified the total damage from the taking in that case amounted to between $2,600 and $2,900; this court held, contrary to the District Court's award, that the total damage was $15,090. In the Hicks case, this court held that the

incidental damage to the property was $90 per acre. In the instant case, appellants seek incidental damage of $50 per acre. The record on this hearing de novo sustains an award of $26,800 for damages to the entire farm.

In the Hicks case, Judge Allen, speaking for this court, held that in a TVA case, the incidental damage to the land not taken was the difference between the value of the land before and after the right-of-way was condemned; and this is the prevailing law in our court today.

In the Hicks case, Judge Allen, speaking for this court, found that the damage resulting from the taking of the right-of-way was $4,920. For incidental damage, this court, in the Hicks case, found that it amounted to $90 an acre—and the incidental value included damage to aesthetic value, and because of fear that the towers might attract lightning.

In the instant case, the three District Judges awarded $2,500 as damages, in addition to the amount conceded by the Government of $1,800 for total damages. There was testimony on the part of the owner of the land that the average layman was scared of high-powered lines, and several witnesses testified as to their fear of these lines. We do not know whether the District Judges took this matter of fear into consideration as an element of damages or not. If they did, it may be assumed that they figured it as incidental damage to the taking of the land for the easement.

In the Hicks case, there were four towers on the land; in the instant case there are four towers on the land. In the Hicks case the right-of-way was 250 feet wide; in the instant case, 150 feet wide. In the Hicks case, the TVA took only 16.4 acres for the easement; in the instant case, the TVA took only 14.9 acres for the easement. In the Hicks case, the farm land was beautiful; in the instant case, the farm land is not only beautiful, but is a "show place."

have felt the light and the hush in the depths of such a forest. I suppose, given

our rapacity, our grandchildren will say we did not deserve such beauty."

In the instant case, there was a wealth of evidence that the towers would interfere with farming, especially plowing operations, because of the necessity of rearranging rows, and because of the inability to turn in the middle of the field with large-sized equipment, such as Big 70 diesel tractors, used on this farm; that there was the added nuisance of having government agents coming onto the farm land with their trucks for repair purposes; and that the efficiency of farming the place was thus reduced because of the towers. The windbreak was a half-mile long and seventy-five feet wide. The TVA cut 216 feet of this windbreak all the way through.

In the Hicks case, this court made an award for incidental damages of $90 an acre for all of the land of the farm not taken for the right-of-way; in the instant case, the District Judges made an award of $4.66 an acre for the land not taken for the right-of-way, giving $1,800 for the taking of the right-of-way, and $2,500 for incidental damages. The award by this court of $90 an acre as incidental damages in the Hicks TVA condemnation case, as compared to $5.00 an acre by the District Judges in the instant TVA condemnation case, seems impossible of reconciliation, either in taking the facts into account, or as a matter of law.

All of the various considerations mentioned above, in any comparison of what this court did in the Hicks case, and what the District Judges did in the instant case, get down to this ultimate point: in Hicks, which was so similar to this case, the award was $90 an acre; and in the instant case, the award was $5.00 an acre.

It may be that the awards made by the Commissioners and the District Judges were in agreement with the vigorous and unqualified arguments of government counsel that injury to aesthetic value was not an element of damages in such a case, and that they were based upon the testimony of the government witnesses to the effect that there was no injury to the aesthetic value of the land, and that they did not consider such injury as an element of damages. On the other hand, it may be that the Commissioners and District Judges did consider injury to aesthetic value as an element of damages. But the giving of an award of $5.00 an acre for damages to aesthetic value, and for destroying 216 feet of a 75-foot-wide windbreak, hardly shows the District Judges were making an award for damages to aesthetic value, in keeping with any principle or measure of damages followed by this court in the Hicks case. The record does not disclose any indication that they did, or did not, consider such injury as an element of damages. We are not a court of errors. We do not consider the "substantial evidence" rule, or the "clearly erroneous" rule in reviewing this judgment. We review the case de novo, according to the statute, "without regard to the awards or findings made by the commissioners or the district judges."

We must, accordingly, decide the case on the record before us. The testimony of witnesses who considered injury to aesthetic value as an element of damages, places the damage to appellants' property at the figure of $26,800. This was the lowest figure testified to by these witnesses. This is the only testimony of damage in which injury to aesthetic value was considered. And it must be followed, if the law holds that injury to aesthetic value is an element of damages, for this testimony is uncontradicted. The witnesses were credible. We are not impressed by the testimony of the government witnesses who denied that there was any injury to the aesthetic value of the place by the erection of the four towers and transmission lines. As in the Hicks case, it is required of us to fix an award, even though, as in that case, it is considerably larger than the award for which judgment was entered in the District Court.

It is said that although this court, by statute, is bound to fix the value of the condemned property, "without regard to the awards or findings * * * made by the * * * district judges," neverthe-

less, under United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, we need not blind ourselves "to the special advantages of the tribunals below in evaluating the evidence." In the Powelson case, the District Judges could not have considered, in evaluating the evidence, their own personal survey and view of the property involved in the claim of damages arising out of the condemnation proceedings, for, in that case, the property condemned included 12,000 acres of land along the Hiwassee River, of which 2,000 acres had been cleared and cultivated. It also included a dam and hydro-electric plant on the Nottely River. Three District Judges could not have arrived at any reasonable conclusion of value by viewing this land, even if it had been physically possible for them to do so; and it appears that they made no such attempt. The Supreme Court in the Powelson case, therefore, did not mean to say that, in evaluating the evidence, the three District Judges, in that controversy, should take into consideration, as any factor in their conclusion, their own estimate of value based upon seeing the property. The statute, however, provides that the District Judges may view the property, and may take additional evidence, and file their own award without regard to the awards or findings theretofore made by the commissioners. But we do not know how the District Judges evaluated the evidence in this case. How did they arrive at a figure of $5.00 an acre for injury to the aesthetic value of the land, in the light of this court's award of damages of $90 an acre in the Hicks case, a TVA condemnation case more similar to the instant case than any adjudication before us? The Hicks case involved a beautiful farm, on which the TVA had condemned a right-of-way, erecting four towers thereon, with a transmission line, and this court based its award on the damage per acre of the entire farm resulting from such condemnation. In the Hicks case, one of the main elements "was the incidental injury due to the towers and power lines visible from every point of the property." In the instant case, from the photographs in evidence, at least three of the towers and lines are apparently visible from every point of the property. Why did not the District Judges award $50 an acre in the instant case, when this was the lowest amount testified to by any witness who took injury to aesthetic value into consideration as an element of damage? We do not know. But it may be said that, while we may avail ourselves of the special advantages of the District Judges in evaluating the evidence, the fact that they could go and look at the property condemned, is, in this case, of no help to us or to them in evaluating the evidence. What District Judge, or what Circuit Judge, going into a county, different from that in which he resides, could make any reasonable award of damages by looking at the property condemned, and how could he arrive at any reasonable conclusion as to the damage resulting to an entire farm, in such county, as the result of the condemnation of a part of it? I know of no judge of any court who could do it. As a matter of fact, of the distinguished District Judges who made this award, one of them did not even view the premises—and I can see no reason why he should. None of the District Judges were experts on value of land in that county. It is not contemplated that they should be. The statute expressly provides that the commissioners shall not be selected from the localities wherein the land sought to be condemned lies. As to a view of the land, the District Judges could examine only the testimony and see whether it corresponded to the physical character of the property and towers and transmission lines in question. They could arrive at no reasonable judgment of its value by merely looking at the land; and their view of the land could only bear upon injury to aesthetic value, on which they were required to follow the Hicks case. The fact that some do not believe in injury to aesthetic value as an element of damages, or do not think that four great towers and transmission lines across a

country show place result in damage, is, it seems to me, effectively disposed of by our decision in the Hicks case.

It may be remarked that, in the Hicks case, the damages proved for the easement alone amounted to $4,920, and the "incidental damage," such as injury to the aesthetic value, was $90 per acre. But it is not necessary for appellants to adduce testimony, separately, as to the damage for the easement, and damage as to aesthetic value. It can be assumed that, without contradiction by appellants, the damage of the taking in this case was $1,800, as testified to by the government witnesses. It is true that, as Judge O'Sullivan observes, the $50 per acre, minimum figure, which appellants' witnesses gave for the loss, included all damage to the farm, without specification of what portion thereof represented aesthetic loss. But I do not see in this case any failure of proof on the part of appellants. As above mentioned, it can be conceded by appellants that $1,800 was the damage resulting from the taking of the easement. Without making an apportionment between damage for the land taken for the easement, and damage for injury to aesthetic value, appellants' evidence is that the entire damage was, at least, $50 an acre for the entire farm resulting from the condemnation, including damage for the taking and damage to aesthetic value. "The incidental damage to the land not taken was the difference between the value of the land before and after the right of way was condemned." Hicks v. United States, supra, 266 F.2d p. 519.

It does not seem to me that we are at liberty to form our own judgment as to the total loss of aesthetic value from all the material before us, unless we form that judgment in accordance with the great weight of the relevant evidence, which consists of the testimony of all the witnesses who took into consideration injury to the aesthetic value of the land as an element of damages; and we can form our judgment only from an evaluation of this evidence. The view of the land, taken by two of the judges, and the pictorial exhibits do not appear to me to be of consequence in evaluating the evidence. One of the District Judges neither looked at the land, nor at the pictorial exhibits.

This case, then, is to be decided on the evidence in the record. The uncontradicted testimony of every witness who took into consideration injury to aesthetic value as an element of damage, was that the damage to this show-place farm, as a result of the condemnation, amounted to $50 an acre. It is not contended that any Commissioners or Judges, completely unacquainted with the property, could look at it and come up with an award of damages of $100 an acre, or $20 an acre, or $5 an acre, or 10¢ an acre, and, without evaluating the relevant evidence before them, influence, by their conclusions, this court, which is directed by statute to fix the value of the condemned property "without regard to the awards or findings * * * made by the * * * district judges." The evidence evaluated must be relevant. In accordance with the decision of this court in the Hicks case, injury to the aesthetic value of land is an element of damages. The testimony of appellants' witnesses is not contradicted, except by the testimony of witnesses who do not consider injury to aesthetic value an element of damages, and, in my opinion, such testimony would be irrelevant.

"It is axiomatic that uncontradicted testimony must be followed. Chesapeake and Ohio Railway Company v. Martin, 1931, 283 U.S. 209, 216, 217, 51 S.Ct. 453, 75 L.Ed. 983; San Francisco Association for Blind v. Industrial Aid for the Blind, 8 Cir., 1946, 152 F.2d 532, 536; Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705. The only exception to the rule occurs when we are dealing with testimony by witnesses who stand impeached and whose testimony is contradicted by the testimony of others or by physical or other facts actually proved or with testimony which is inherently improbable." Grace Brothers v. Com-

missioner of Internal Revenue (9 Cir.), 173 F.2d 170, 174.

"Where, however, the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and it is not opposed to the probabilities; nor, in its nature, surprising or suspicious, there is no reason for denying to it conclusiveness." Chesapeake & Ohio Ry. v. Martin, 283 U.S. 209, 218, 51 S.Ct. 453, 457.

As we do not apply the "clearly erroneous" rule to the award, or the "substantial evidence" rule, we should follow the direction of the statute requiring this court to make the award. I would favor an award of $26,800, in accordance with the great weight of the testimony in the record before us, provided, as heretofore said, it is hereafter found that the towers and transmission lines in question serve an authorized TVA purpose.